UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
JOVANNY GOMEZ,

                     Petitioner,

     - against -

UNITED STATES OF AMERICA,

                     Respondent.
------------------------------------------------------------------x
AMON, Chief United States District Judge.

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
10-CV-01886 (CBA)

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JAN 4 – 2013 ★

BROOKLYN OFFICE

       Petitioner Jovanny Gomez, a citizen of the Dominican Republic, filed this motion for a writ of habeas corpus pursuant to 28 U.S.C. § 2255, seeking to vacate, set aside or correct his sentence. Gomez pleaded guilty, pursuant to a cooperation agreement, to one count of conspiracy to distribute five kilograms or more of cocaine in violation of 21 U.S.C. § 846, a conviction that placed him in a class of "deportable aliens" subject to mandatory removal under §§ 237(a)(2)(A)(iii) and 237(a)(2)(B)(i) of the Immigration and Nationality Act ("INA"). The Department of Homeland Security ("DHS") subsequently initiated removal proceedings against him, a process that culminated in a deportation order. In his § 2255 motion, Gomez claims that his counsel, in violation of the Sixth Amendment, provided ineffective assistance during his plea negotiations by giving him "incorrect advice regarding the immigration consequences of a guilty plea." (Pet'r Mot. at 3.) For the reasons stated below, the Court denies his motion.

## BACKGROUND

### I. Factual Background

       Gomez was arrested in October 2004 for his involvement in a cocaine distribution conspiracy. His arrest was a result of an investigation by the United States Immigration and

1

Customs Enforcement ("ICE") into an organization that imported cocaine, shipped in cargo containers from Colombia, through the Howland Hook Marine Terminal ("Howland Hook") in Staten Island, New York. The ICE investigation revealed Gomez as the individual who, on August 28, 2003, picked up Alberto Brens, a co-conspirator, in Staten Island after Brens had fled from authorities in a truck loaded with dozens of kilograms of cocaine that had been retrieved from Howland Hook. A confidential witness advised ICE agents that Gomez had assisted Brens with the removal of the cocaine from Staten Island, and that Brens and Gomez took the cocaine to an address in New Brunswick, New Jersey, identified as the home of Gomez's sister, Maritza Gomez. Telephone records gathered during the investigation reflected that Brens called Gomez from Staten Island in the early morning on August 28, 2003. Additionally, cell site information for Gomez's cell phone indicated that, early in the morning on August 28, 2003, Gomez traveled from New Brunswick, New Jersey to Staten Island and then back to New Brunswick. Based on this information, agents obtained a warrant for Gomez's arrest. (See Resp't Opp'n, Ex. D.)

Following his arrest on October 28, 2004, and after having been advised of and waiving his Miranda rights, Gomez made substantial post-arrest statements. Gomez stated that in the early morning hours of August 28, 2003, he received a telephone call from Brens, who told Gomez that he needed Gomez to pick him up on Staten Island. Gomez drove to Staten Island and found Brens, who was very nervous and dressed all in black. Brens got into the car, directed Gomez to drive around the block and behind a house, and explained that he had some "stuff" in the back of a pick-up truck that was parked there. Gomez admitted that at this point, he suspected Brens was referring to drugs. (See Resp't Opp'n, Ex. C at 3.)

Gomez then told agents that he and Brens removed three large brown bags from the pick-up truck and put the bags into Gomez's car. He admitted that while moving the bags from the

2

truck, he felt nervous and was aware that he was dealing with drugs. Gomez stated that on the drive back to New Jersey, Brens called Gomez's sister and made arrangements to store the drugs in the basement of her home in New Brunswick. The next day, Brens told Gomez that the owner of the drugs, "Alex," was coming to pick up the drugs. Gomez went to Brens' house and, later that day, Brens arrived in a panic saying that an individual named "Carlos" had stolen the drugs from Gomez's sister's house. (Id. at 4.)

Brens and Gomez went to the house and found only one bag of drugs, containing approximately 26 kilograms of cocaine, left behind. Gomez stated that Brens gave him four kilograms of cocaine for his help. Gomez admitted that he sold the cocaine to an individual who took it to Philadelphia. (Id. at 5.)

## II. The Plea Agreement

Gomez began to meet with the government in proffer sessions on December 2, 2004. On March 15, 2005, he pleaded guilty, pursuant to a cooperation agreement, to one count of conspiring to distribute five kilograms or more of cocaine in violation of 21 U.S.C. § 846. Along with the maximum and minimum terms of imprisonment, periods of supervised release, and fines, the cooperation agreement listed as one of the statutory penalties of the charge: "Other penalties: deportation/removal." (Resp't Opp'n, Ex. A at 2.) During the plea proceedings before Magistrate Judge Viktor V. Pohorelsky, Gomez affirmed that he had read the entire plea agreement, had discussed it with his attorney, and understood all its provisions. (See Pet'r Mot., Ex. A at 13.) Magistrate Judge Pohorelsky advised Gomez that he was facing a term of imprisonment of anywhere from ten years to life, as well as a supervised release term of at least five years. (Id. at 15.) With respect to the possibility of deportation, Magistrate Judge Pohorelsky advised Gomez that "[u]pon conviction for this offense, you are subject to

3

deportation or removal. That means that you can be expelled from the United States and returned to your country of citizenship or national origin." When he asked Gomez whether he understood, Gomez responded, "Yes." (Id. at 17.)

Gomez subsequently testified in United States v. Brens, 04 CR 515 (S-4) (DGT), substantially reiterating the version of the events that he had recounted for the ICE agents post-arrest. (Resp't Opp'n, Ex. B.) Gomez was sentenced on August 20, 2008. Based on Gomez's cooperation, the government filed a letter pursuant to Section 5K.1.1 of the U.S. Sentencing Guidelines, and Judge David Trager imposed a below-guidelines sentence of time-served. (See Pet'r Mot., Ex. B at 6.) Judgment was entered in his criminal case on September 15, 2008. Gomez did not appeal.

**III. Gomez's § 2255 Motion**

In the instant motion, Gomez claims that his trial counsel, Heriberto Cabrera, was ineffective for misinforming him of the deportation consequences of his guilty plea. Specifically, he asserts that Cabrera improperly indicated that his plea would not result in mandatory removal and "incorrectly advised Mr. Gomez that there was a chance he would be allowed to say [sic] in the United States in spite of his conviction of a drug offense." (Pet'r Mot. at 3.) Prior to his conviction, Gomez was a lawful permanent resident in the United States. (Pet'r Mot., Ex. D.) Gomez's conviction under 21 U.S.C. § 846, however, subjected him to mandatory removal pursuant to §§ 237(a)(2)(A)(iii) and 237(a)(2)(B)(i) of the INA. Indeed, on January 12, 2012, the DHS sent Gomez a Notice to Appear and subsequently detained him and placed him in removal proceedings. (Id.)

On April 28, 2010, a year and a half after judgment was entered in his criminal case, Gomez filed the instant motion. Noting that motions filed pursuant to § 2255 have a one-year

4

statute of limitations that typically runs from the date on which the petitioner's judgment of conviction becomes final, 28 U.S.C. § 2255(f)(1), the Court issued an order to show cause why his § 2255 motion was timely on April 30, 2010. (DE #2.) In response, Gomez claims that he had not been aware of the mandatory nature of his deportation until he received the Notice to Appear on January 12, 2010. (Dash Affirm. at 1-3) He also suggests that the Supreme Court's decision in Padilla v. Kentucky, 130 S. Ct. 1473 (2010), issued on March 31, 2010, newly recognized and made retroactive to cases on collateral review the right asserted in this case, thereby setting the date of Padilla as the start of the limitations period under § 2255(f)(3). (Id. at 3-4.)

In an affidavit in support of his § 2255 motion, Gomez states that during plea negotiations, he repeatedly asked his trial counsel, Cabrera, whether a conviction could lead to his deportation. (Pet'r Mot., Ex. C at 2.) According to Gomez, Cabrera responded equivocally stating, "It may or may not; hopefully not," and told him he was a "good guy" and a "good kid." (Id.) Gomez states that he interpreted these statements to mean "that there was a chance that I would not be deported" and that he believed his cooperation with the government increased his chances of remaining in this country. (Id.) Gomez states in addition that at his many meetings with the government, "the prosecution never mentioned mandatory deportation." (Id. at 3.) Against this backdrop, Gomez claims that he took the statements regarding deportation in his plea agreement and Magistrate Judge Pohorelsky's statements at his plea allocution to mean that deportation was only a possibility. Gomez claims that "[i]f I knew that I was facing mandatory deportation, I would not have taken the plea and would have taken my chances at trial." (Id. at 3.) He believes, moreover, that he had a "good defense" to the criminal charges because he "did not know what was in the duffel bags" that were transported from Staten Island and claims that

5

he only stated that he went to Staten Island to pick up drugs because that was "what they wanted to hear." (Id. at 4-5.)

Cabrera has also submitted an affidavit stating that he "do[es] not remember or recall whatever advice [he] may have provided the Petitioner regarding the immigration consequences of his plea." (Cabrera Aff.)

## DISCUSSION

### I.  Standard of Review

Pursuant to 28 U.S.C. § 2255, a federal prisoner can seek post-conviction relief in cases where his sentence: "(1) was imposed in violation of the U.S. Constitution or the laws of the United States; or (2) was entered by a court without jurisdiction to impose the sentence; or (3) exceeded the maximum detention authorized by law; or (4) is otherwise subject to collateral attack." Adams v. United States, 372 F.3d 132, 134 (2d Cir. 2004).  A defendant who pleads guilty may challenge his sentence under § 2255 where "the plea agreement was not knowing and voluntary because 'the advice he received from counsel was not within acceptable standards.'" Parisi v. United States, 529 F.3d 134, 138 (2d Cir. 2008) (internal citation omitted).  Put differently, "to the extent that counsel's deficient performance undermines the voluntary and intelligent nature of defendant's decision to plead guilty" that performance may deprive the defendant of his Sixth Amendment right to effective counsel, United States v. Arteca, 411 F.3d 315, 320 (2d Cir. 2005), and thus warrant habeas relief. See Parisi, 529 F.3d at 138; Cortez v. United States, Nos. 09 CV 72200, 05 CR 55, 2011 WL 666245, at *4 (S.D.N.Y. Feb 10, 2011).

The framework articulated in Strickland v. Washington, 466 U.S. 668 (1984), guides the analysis of a claim of ineffective assistance of counsel.  To prevail on such a claim, the petitioner must make two showings.  He must first demonstrate that counsel's representation "fell below an

6

objective standard of reasonableness" as measured by "prevailing professional norms," Strickland, 466 U.S. at 688, and "'evaluated from counsel's perspective at the time of the alleged error,'" United States v. Pitcher, 559 F.3d 120, 123 (2d Cir. 2009) (quoting Kimmelman v. Morrison, 477 U.S. 365, 381 (1986)).  In considering whether a petitioner has met this deficiency prong, courts must be "highly deferential" to counsel's performance and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689.  Second, the petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," i.e., that the petitioner was prejudiced by counsel's deficient performance. Id, at 694; Pitcher, 559 F.3d at 123.  In the plea context, this prejudice prong requires the petitioner to show that "there is a reasonable probability that, but for counsel error's, [the petitioner] would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 59 (1985); see also Premo v. Moore, 131 S. Ct. 733, 745 (2011).

## II. Application of **Strickland**

In his § 2255 motion, Gomez asserts that "prevailing professional norms" at the time of his plea negotiations required defense counsel to "'be fully aware of, and make sure that the client is fully aware of . . . consequences of conviction such as deportation' and . . .[to] explain to the client the potential consequences of any plea agreement." (Pet'r Mot. at 6.)  Mandatory removal, Gomez argues, is a straightforward immigration consequence of a conviction under 21 U.S.C. § 846.  Accordingly, Cabrera's "optimistic response" that Gomez "may or may not" be subject to removal was incorrect advice as to the consequences of the plea agreement and thus constituted deficient performance, a conclusion, Gomez contends, that is reinforced by the Supreme Court's decision in Padilla v. Kentucky, 130 S. Ct. 1473 (2010).  Had he known he

7

faced mandatory removal, Gomez continues, he would have opted to take his chances at trial and was thus prejudiced by Cabrera's unprofessional errors. (Id. at 7.)

Respondent counters that the Court should dismiss Gomez's petition because (1) it is untimely; (2) the record belies his contentions that his representation was deficient; and (3) he cannot establish prejudice. The Court need not decide the first and second issues, as it agrees with respondent that Gomez has not established that he was prejudiced by his counsel's alleged misrepresentations.

For purposes of this Order, therefore, the Court assumes without deciding two threshold issues. First, the Court assumes that Gomez's petition is timely based on Gomez's contention that because he had not been aware of the mandatory nature of his removal until he received the DHS Notice to Appear in January 2010, it was that event that trigged the one-year limitations period as "the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2255(f)(4). The Court also assumes that Gomez's allegations, if true, demonstrate "affirmative misrepresentation[s] by counsel as to the deportation consequences of a guilty plea" rather than simply a failure to inform. United States v. Cuoto, 311 F.3d 179, 188 (2d Cir. 2002). Under this assumption, Cabrera's statements would constitute "objectively unreasonable" representation under the law in the Second Circuit at the time of his plea negotiations and subsequent conviction, thus satisfying Strickland's deficiency prong. Id. ("We believe that an affirmative misrepresentation by counsel as to the deportation consequences of a guilty plea is today objectively unreasonable. We therefore hold that such a misrepresentation meets the first prong of the Strickland test.").[1]

---

[1] Gomez argues that the Supreme Court's decision in Padilla, issued in March 2010, many years after his plea negotiations, is relevant both to the timeliness of his motion and to the evaluation of counsel's deficient performance under the first prong of Strickland. (Dash Affirm. at 4-5.) In Padilla, the Supreme Court held that counsel's failure to inform a criminal defendant of the immigration consequences of his plea falls below an "objective standard of

8

Employing these assumptions, the Court's evaluation of Gomez's ineffective assistance of counsel claim thus turns on whether he can show a reasonable probability that, but for counsel's error, he would have rejected the plea and insisted on trial. Even where counsel's deficient performance has been established, however, "it is often quite difficult for petitioners who have acknowledged their guilt to satisfy Strickland's prejudice prong." Padilla, 130 S. Ct. at 1485 n.12 (remanding on the issue of prejudice after finding counsel's failure to inform client of risk of deportation "objectively unreasonable"). "[T]o obtain relief on this type of claim, a petitioner must convince the court that a decision to reject the plea bargain would have been rational under the circumstances." Id. at 1485 (citing Roe v. Flores-Ortega, 528 U.S. 470 (2000)); see also Hill, 474 U.S. at 59-60; United States v. Arteca, 411 F.3d 315, 321-22 (2d Cir. 2005).

In making this determination, [c]onclusory allegations that a defendant would have insisted on proceeding to trial are generally insufficient to establish actual prejudice under Strickland." Scott v. Superintendent, No. 03-CV-6383, 2006 WL 3095760, at *9 (E.D.N.Y. Oct. 31, 2006); see also Arteca, 411 F.3d at 322; Silent v. Perlmann, No. 07-CV-4524, 2008 WL 5113418, at *13 (E.D.N.Y. Nov. 25, 2008). Indeed, the Second Circuit generally "requires some objective evidence other than defendant's assertions to establish prejudice." Pham v. United States, 317 F.3d 178, 182 (2d Cir. 2003) (citing United States v. Gordon, 156 F.3d 376, 380-81 (2d Cir. 1998)). In the immigration context, the petitioner must "affirmatively prove prejudice" by putting forth credible evidence that he "would actually have insisted on going to trial had he

---

reasonableness." 130 S. Ct. at 1486. Padilla eliminated the distinction between a failure to inform and an affirmative misrepresentation in the deficiency prong analysis, a distinction which the Second Circuit had previously recognized in Cuoto. In employing the above as assumptions, however, the Court need not reach the questions of whether Padilla announced a new rule of constitutional law (affecting timeliness) or whether its holding applies retroactively to cases on collateral review (altering the deficiency prong analysis). See Strickland, 466 U.S. at 697 ("[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.").

9

known of the precise immigration consequences of his conviction." Boakye v. United States,
No. 09 Civ. 8217, 2010 WL 1645055, at *5 (S.D.N.Y. Apr., 22, 2010) (citing Strickland, 466
U.S. at 693); see also Zhang v. United States, 543 F. Supp. 2d 175, 184-85 (E.D.N.Y. 2008).
Particularly where there is "extensive evidence of his guilt," the petitioner must articulate a
convincing basis on which he would have foregone "the substantial benefit resulting from his
plea" and risked a harsher sentence at trial. Boakye, 2010 WL 1645055, at *5-6; see also Arteca,
411 F.3d at 321-22 (no showing of prejudice where defendant was aware that plea agreement's
sentencing estimate was not binding, received benefits from the plea deal, and had "not provided
any persuasive reason for doubting the strength of the government's case against him").

To support his claim of prejudice, Gomez offers only his conclusory assertion that "[i]f I
knew that I was facing mandatory deportation, I would not have taken the plea and would have
taken my chances at trial." (Pet'r Mot., Ex. C at 3.) He fails, however, to support this assertion
with evidence establishing a "reasonable probability" that even if he had received accurate
advice, he would have rationally decided to take his chances at trial. To be sure, Gomez does
state that he repeatedly asked Cabrera about his chances of staying in the United States under the
plea agreement. Although these inquires certainly indicate that Gomez wanted to know what his
removal prospects were under the agreement, they do not by themselves demonstrate that he
would not have agreed to the plea had he known removal was mandatory. Rather, Gomez
appears to rely on the presumption that the harshness of removal is in itself sufficient evidence
that he would have jumped at any chance—even a small one—to avoid that certain result. The
fact of certain removal, however, does not, without more, constitute "objective evidence" of
what he was reasonably likely to do had he received accurate advice. Even under his own
version of the facts, Gomez was informed by his attorney, his plea agreement, and Magistrate

Judge Pohorelsky that deportation was at least a possible consequence of his plea, and he nonetheless accepted the government's cooperation agreement.

In addition, Gomez offers no evidence that his prospects had he proceeded to trial offered a realistic possibility of a better outcome such that he would have rationally chosen to take the risk of a harsher sentence rather than accept the plea. As the Court has already detailed, there was overwhelming evidence supporting his conviction, including his own detailed post-arrest admissions, cell phone records, and statements of a cooperating witness. Gomez's cursory contention that he had a viable defense premised on lack of knowledge is simply belied by the record. Indeed, his post-arrest statements alone make clear that he was aware that he was handling drugs. (See Resp't Opp'n, Ex. C at 3-4.) Had he proceeded to trial, moreover, Gomez risked a substantially harsher sentence. A single charge under 21 U.S.C. §§ 846, 841(b)(1)(A)(ii)(II) imposes, on top of mandatory removal, a sentence of ten years to life. Indeed, Brens, who did not cooperate and instead proceeded to trial, received a sentence of 120 months' incarceration. (Resp't Opp. at 24.) In contrast, as a result of Gomez's plea and cooperation, he received a sentence of time-served after having spent less than three years in jail.

Given that Gomez knew that removal was at least a possible consequence of his plea, the "extensive evidence of his guilt," and the "substantial benefit resulting from his plea" that he would forego if he proceeded to trial, the Court cannot discern a reasonable probability that he "would actually have insisted on going to trial had he known of the precise immigration consequences of his conviction." Boakye, 2010 WL 1645055, at *5. Indeed, Gomez has failed to present any "evidence showing why he would have risked a trial when the likely outcome was both exposure to deportation and a substantial, preceding custody term." Herrera v. Hynes, No. CV-08-1651, 2008 WL 5068608, at *3 (E.D.N.Y. Nov. 21, 2008); cf. Matos v. United States,

11

No. 99 Cr. 137, 2012 WL 569360, at *4 (S.D.N.Y. Feb. 16, 2012) (in addressing petitioner's

coram nobis petition, finding no prejudice where "[a] conviction after trial would, in all

likelihood, ensure that [petitioner] was imprisoned for a significant term of incarceration before

facing the same immigration consequences," making it "irrational for [petitioner] to proceed to

trial" (citing Premo, 131 S. Ct. at 744)).

Accordingly, as Gomez has failed to establish that he was prejudiced by his trial

counsel's alleged errors, his claim of ineffective assistance of counsel is denied, and no further

evidentiary hearing is necessary. See 28 U.S.C. § 2255 (hearing not required where "the motion

and the files and records of the case conclusively show that the prisoner is entitled to no relief");

Boakye, 2010 WL 1645055, at *6 ("[T]he Second Circuit has made clear that no hearing is

required where (1) the allegations of the motion, accepted as true, would not entitle the petitioner

to relief; or (2) the documentary record renders a testimonial hearing unnecessary." (citing

Chang v. United States, 250 F.3d 79, 85-86 (2d Cir. 2001)).

### CONCLUSION

For the foregoing reasons, Gomez's motion to vacate, set aside or correct his sentence

pursuant to 28 U.S.C. § 2255 is denied. Since Gomez has failed to make a "substantial showing

of the denial of a constitutional right," a Certificate of Appealability shall not issue. 28 U.S.C.

§ 2253. The Clerk of Court is directed to enter judgment accordingly and to close this case.

SO ORDERED.

Dated: Brooklyn, New York
     January   4 , 2013

_s/Carol Bagley Amon

Carol Bagley Amon
Chief United States District Judge

12